[No. 1759.]

## THE COLORADO FUEL & IRON CO. v. THE STATE BOARD OF LAND COMMISSIONERS.

1. MANDAMUS—CONTRACTS—STATE LAND BOARD.

Mandamus will lie against the state board of land commissioners to compel the execution of a contract of lease theretofore agreed upon, with respect to which rights of the lessee have vested and where there is nothing left to be done to complete the contract but to perform the ministerial duty of executing it and where no rights of third parties are involved.

2. SAME—RIGHTS OF THIRD PARTIES—SUBSEQUENT CONTRACT.

Where rights of third parties are involved mandamus will not ordinarily lie to compel the execution of a contract, but where an agreement is made with the state board of land commissioners that vests in the lessee the right to have a lease executed, a subsequent lease of the land by the board to a third party vests no rights in the third party that would preclude the original lessee from proceeding by mandamus to compel the board to execute the lease.

3. MANDAMUS—IMPOSSIBILITY OF PERFORMANCE.

In a mandamus proceeding to compel the performance of an act, the respondent cannot plead as a defense that it is impossible for him to perform the act where the impossibility has been occasioned by his own doing.

4. STATE BOARD OF LAND COMMISSIONERS—LEASING COAL LAND.

The matter of leasing the coal lands of the state as to terms and conditions of the lease and the time for which the lease may run is wholly within the discretion of the state board of land commissioners.

5. SAME—RENEWAL OF LEASE—STATUTORY CONSTRUCTION.

The provisions of the act of 1895, 3 Mills' Ann. Stats. sec. 3636, limiting the time that any lease of state lands shall run to a term of ten years and regulating the methods of renewing such leases have no application to the leasing of coal lands.

6. CONTRACTS—LEASING COAL LAND—STATE LAND BOARD.

Where a coal company having a lease on certain state coal land applied for a renewal of the lease and the state board of land commissioners ordered that upon surrender of the old lease a new lease be granted for ten years upon the same terms as the old, except an increase in the minimum amount of royalty, which proposition of the board was accepted by the company and the company surrendered its old lease and agreed with the board upon a new lease and paid to the proper officer the semi-annual minimum royalty which was

accepted and not returned or offered to be returned for several months afterwards, all of which appeared by the records of the land board, there was a complete and specific contract that vested a right in the lessee and he was entitled to an executed lease and might enforce his right by mandamus.

7. SAME—RESCISSION BY SUBSEQUENT BOARD.

Where the state land board contracted with a coal company to lease the company certain lands, and the company paid the first semi-annual payment of minimum royalty and nothing remained to be done except a formal execution of the lease, a new board succeeding the old by reason of a change in the administration has not the power to revoke the action of the former board and rescind the contract but may be compelled by mandamus to execute the lease.

8. APPELLATE PRACTICE—RECORD—OPINION OF TRIAL COURT.

The incorporation of the opinion of the trial judge in the record on appeal is a commendable and proper practice, and the appellate court will resort to such opinion to ascertain the basis on which he rests his conclusions.

9. APPELLATE PRACTICE—CROSS ASSIGNMENT OF ERRORS.

Appellees and defendants in error have a right to file cross assignments of error and thereon obtain the opinion of the appellate court to guide the lower court in a subsequent trial in case of reversal.

10. CONTRACTS—MISREPRESENTATIONS—RESCISSION.

An affidavit of the manager of a coal company applying for the renewal of a lease to state coal land to the effect that it was impracticable to mine coal from the section except by entries through adjacent lands then being worked by the company and could not be worked from the surface at any point on the section leased, was not a statement of fact upon which the land board would have the right to rely in determining whether or not they should renew the lease or grant a new one, but was simply an expression of opinion upon a matter equally within the knowledge of the land board, and was not such representation, if untrue, as would justify a rescission of a contract of lease on the ground that it was obtained by fraudulent misrepresentations.

11. APPELLATE PRACTICE — FINDINGS OF TRIAL COURT—PRESUMPTIONS—LEGALITY OF MEETING OF LAND BOARD—NOTICE TO MEMBERS.

On the question as to whether a special meeting of the state board of land commissioners at which one of the members was not present was a legal meeting where the evidence was conflicting as to the service of notice on the absent member, the finding of the lower court in favor of the presumption that the register did his duty and served the notice will be sustained by the appellate court.

*Appeal from the District Court of Arapahoe County.*

WHILE this suit is nominally a proceeding by way of mandamus to compel the state land board to issue a lease to the Colorado Fuel & Iron Company for coal mining purposes on certain lands belonging to the state, we are quite well able to see from the record that it is in reality and in substance a controversy between the Colorado Fuel & Iron Company under their claim of right to this lease as against the Victor Coal & Coke Company, which holds a lease from the state issued by the land board to the same section. It is unnecessary to state in detail, or otherwise than in a general way, the inception of the claim asserted by the fuel and iron company. The fuel company went into possession in 1892 and continued to pay rent according to the terms of the original lease up to the time of the happening of the events appearing in this litigation. The fuel company owned or leased adjacent property and thereon carried on what they have designated as the Pictou mine, wherefrom they have extracted large quantities of coal and wherein they have prosecuted a large amount of development. Inclines, drifts, levels and raises have been run toward the disputed section and have penetrated that land to quite an extent. It does not appear from the record that development was prosecuted in the disputed section to such an extent as to determine its value, or to admit the extraction of any large quantity of coal, though it would appear to be the evident purpose of the fuel company ultimately to exploit the section and extract whatever coal may be found in it. This is relatively unimportant, except as it relates to one proposition which will be more generally referred to in the opinion. The lease under which the fuel company claimed title expired on the 23d of March, 1897. On November 23, 1896, the company filed with the state land board an application to renew lease No. 5244 which covered section 36, township 27 south, range 67 west in Huerfano county, and offered to pay a royalty of ten cents per ton on 600 tons minimum and thereafter on all merchantable lump coal mined at the same rate. This application was supported by an affidavit made by Kebler as

the general manager of the company, stating that the corporation had made all reasonable effort to reach the coal in section 36, and stating also that the coal in the upper vein in that section did not prove to be workable, being too thin, and the workings in that direction were practically abandoned. The affiant also states that the workings on the lower vein in the Pictou were being extended in the direction of section 36 and would soon reach it. Affiant further states that it is not practicable to work the mine from the surface at any point on the section, but only from adjacent ground, and that any coal on section 36 could be more advantageously mined through the entries in the Pictou and by means of the plant of the company than by any other method. The application went before the board and was formally considered by that body at a special meeting which was held on the 30th of December, 1896. The records of the land board show that all the members were present except Mrs. Peavey, who was the superintendent of public instruction, and at that meeting the board transacted a very considerable amount of business. It passed on the application of the citizens of a town requesting the surrender to the United States government of a section, a petition for a division of lands held under certificates of purchase under which the board ordered a deed to be issued to petitioner for certain lands belonging to the state upon the surrender of the certificates. Then follows, according to the record, the application of the fuel company in the following terms: "An application was presented from the Colorado Fuel & Iron Company for an extension of ten years of their lease No. 5244. The board ordered that upon surrender of said lease a new lease be granted to said company for ten years from this date, at a minimum royalty of two hundred dollars ($200) per annum, otherwise upon the usual terms." Then follows an application for change of terms on lease No. 6686. A resolution was then presented concerning a right of way fully described. This was all the business done at that meeting and the proceedings are regularly signed and attested by the then gov-

ernor, Albert W. McIntyre, the register, Meldrum, and his deputy. As stated, this was not a regular meeting provided for by statute or by the practice of the board, but was called to act on these several matters. There is considerable controversy respecting the giving of notice to all the members, it being insisted that Mrs. Peavey received no notice of that meeting. From the opinion of the court it would appear it did not find as a fact that Mrs. Peavey failed to have notice, but on the other hand concluded from the evidence as well as from presumptions attending the action of public officers, that there was no proof sufficient to justify a conclusion that notice had been given to Mrs. Peavey. This will be further commented on in our opinion. Thereafter the Colorado Fuel & Iron Company sent its check for the half year's minimum royalty of $100 and $1.00 for recording fee which was accepted by the then register, Meldrum. The royalty was not paid in cash, but no question was made by the register concerning the check, and it had theretofore been his custom to receive the checks of this company in payment of whatever was due the state and receivable by the land board, and such had been the general custom of the land office in regard to all payments by lessees or purchasers where parties were of known responsibility. The register thereupon notified the fuel company to prepare and file its bond for the faithful performance of its contract. The bond was prepared, sent, accepted, and filed. Subsequently, a member of the board who was then the attorney general, for some reason which is not wholly apparent, directed the register or requested him to delay the execution of the lease under the vote of the board, awaiting further action. Subsequently the Victor Coal & Coke Company, through its president, and probably through its general manager, addressed letters to the board or some of its members, expressing a desire to obtain a lease on section 36. This was really the beginning of the controversy. In the letter they offered to pay a minimum royalty of $1,000 a year. Matters were delayed from time to time until subsequently, and in June, 1897, the matter of the lease

seems in some fashion to have been put up at auction and the Victor Coal & Coke Company bid $4,100 as the minimum royalty, and it being the largest sum offered, was accepted by the board and the lease of this section executed to the Victor Coal & Coke Company.   The fuel and iron company constantly protested and insisted on the execution of the lease which they had frequently demanded, but the board declined to do anything further in the premises.   It must be here stated that the board in 1897 was not the board which acted in 1896.   Its personnel was entirely changed with the exception of the attorney general.   There was a new governor, a new register and a new superintendent of public instruction.   It was this new board that undertook to reverse and set aside the action theretofore taken by the land board and to issue the new lease.   It may be stated that we do not regard the increased royalty offered by the Victor Coal & Coke Company as a matter which either necessarily or presumptively is one of greater advantage to the state, or one likely to bring them larger revenues than would the new lease to the fuel company under the same terms as were contained in No. 5244.   It may be stated that under the terms of all mining leases issued by the state land board, and particularly under the terms of 5244, the company operating the mine would be. bound to pay ten cents per ton on all merchantable lump coal extracted.   It may be quite true that until the development was carried to a successful point and the extraction of coal in large quantities begun, a greater immediate revenue would result to the state, though its ultimate profit must of necessity be the same because the revenue is ten cents per ton on whatever is taken out, and if 41,000 tons be taken out $4,100 would of course be the revenue.

There was no offer to return to the Colorado Fuel & Iron Company its check or the money which it represented for many weeks after its receipt and not until the latter part of March, 1897.   On the failure of the land board to execute the lease according to the apparent agreement as exhibited

by the record the Fuel & Iron Company proceeded by way of mandamus to compel its execution. We need not refer to the alternative writ or its terms, nor to the return or answer of the land board, nor to the stipulation of counsel under which these proceedings were carried to a conclusion. Thereon a hearing was had and evidence introduced. As already suggested there was evidence given by Mrs. Peavey and her assistant with reference to the failure to serve notice of the special meeting, and evidence per contra. There was also much attempted to be offered and some given by some members of the land board with reference to the reason for their failure to execute the lease in accordance with their recorded action. It was testified to by some of them that they were considerably influenced by the affidavit of Mr. Kebler concerning the impracticability of operating this section from the surface and opening it up in the usual way. We do not regard this of very much consequence, but it is referred to and made the basis of argument by counsel. Evidence was also introduced respecting thé subsequent operations of the Victor Coal & Coke Company. It appeared therefrom that after the execution of the lease to that concern, they proceeded to open up the property from the surface. The Victor Coal & Coke Company in order to pursue its development and open up the property from the surface, was apparently compelled to buy adjacent property to which they built a spur from the railroad and whereon they erected the bulk of their tipple comprising almost entirely the surface improvements, houses and machinery plant necessary to prosecute the work. The only significance to be attached to this fact is with reference to the affidavit of Mr. Kebler, the general manager, respecting his belief concerning the practicability of opening up the mine from the surface. On the conclusion of the trial, the court entered the usual order and found the issues for the defendant and against the plaintiff and denied the application for the writ. Neither party called for findings of fact, though it would appear the court's opinion was requested and it was announced, and the opinion is before us in the re-

cord.   Wherefrom it would appear the court held there were five propositions presented to be considered.   The first respected the meeting of December 30, which he held valid, the burden being on the defendant to show its invalidity, which was overcome by the evidence and the presumption that the officer did his duty.   As to the second proposition the court was of the opinion that there was not sufficient evidence of fraud to warrant the court to hold that the order of December 30 was obtained by fraud or deceit.   The third proposition respected the power of the board to renew the lease under application for the purpose made more than thirty days before its expiration; the fifth proposition concerned the propriety of proceeding by way of mandamus, and about it the court expressed no opinion.   Prior to the hearing a motion was made to strike this opinion from the record which was denied.   The board also filed cross assignments of error which were also subjected to a motion to strike out, which was denied, though on the oral argument nothing was insisted on about it, although it appears in the brief.   Part of the real controversy and the substantial part of it so far as concerns the decision of the lower court, and probably so far as concerns our opinion, turns on the statute.   The matter of leases of state lands has been the subject of very much legislation.   An act was passed in 1887, Session Laws of 1887, p. 328, 2 Mills' Ann. Stats. sec. 3634, which attempts to regulate the leasing of state lands.   The only matter with which we are concerned is section 8 which in general provides that the state land board may lease any portion of the lands of the state at a rental of not less than ten per cent of the valuation.   After other provisions we find an independent sentence in that section to the effect: "if stone, coal, coal oil, or gas or other mineral not herein mentioned be found on the land, such land may be leased, etc., for such a length of time, and conditioned on the payment to the board of such royalty, etc., as the land commissioners may determine."   This is the only section found in the act specifically relating to coal or mineral lands or the right of the land

board respecting its power to lease or regulate their acts in the premises. The subsequent section 10, relating generally to leasehold rights, the methods of acquirement, and in some aspect relating to the powers and duties of the land board was subsequently amended in 1895. Session Laws of 1895, c. 87, 3 Mills' Ann. Stats, sec. 3636, which is :

" No lease of state land shall be for a longer term than ten years. When any lease expires by limitation, the holder thereof may renew the same in manner as follows : At any time within the thirty days next preceding the expiration of the lease, the lessee or his assigns shall notify the register of his desire to renew said lease ; if the lessee and state board .agree as to the valuation of the land, a new lease may be issued bearing even date with the expiration of the old one, and upon like conditions ; *Provided always*, that the former valuation shall not be decreased without the consent of the state board ; *Provided*, that nothing in this section shall prohibit the state board from leasing any of the state lands to such party or parties as shall secure to the state the greatest annual revenue : *Provided further*, that the state board may in its discretion offer said land for sale at the end of any period of five (5) years, during the term of said lease, upon the same terms and in the same manner as though said lease had not been executed."

Under this section as has already been suggested the trial court concluded the land board had no power to renew except on an application made at a specified time, to wit : within thirty days next preceding its expiration, and rendered judgment accordingly, from which The Colorado Fuel & Iron Company prosecutes this appeal.

Mr. D. C. BEAMAN, for appellant.

Messrs. YEAMAN & GOVE and Mr. W. W. ANDERSON, for appellees.

BISSELL, P. J.

I have stated this controversy with extreme particularity

and great fullness because the facts are absolutely essential to a correct understanding of the issue and essential as a basis whereon to apply the law.   The legal questions require much less consideration and a very limited argument because the vital propositions have been determined by the adjudications of the supreme court and our own antecedent decisions. Under those adjudications as we understand them there is in reality but one open question and this respects only the construction of the act of 1887 as amended by the act of 1895,

The appellees question the propriety of the proceeding by mandamus to enforce the appellant's rights and insist the only remedy is by bill in equity or by *certiorari*.   Much learning and ingenuity is exhibited in their argument, and it must be conceded very large support for the contention is found in the adjudications of sister states.   The whole matter, however, was made the subject of very elaborate discussion and consideration by the supreme court, and the right of parties to proceed against the land board by way of mandamus under certain circumstances analogous though not entirely similar to the present fully sustained in an exhaustive opinion.   The circumstances under which this proceeding might be adopted for the purpose of effectuating asserted rights were elaborately considered and fully determined.   It was adjudicated that this proceeding might be initiated as against this particular board, to wit, the state land board, and wherever their discretion had already been exercised and there was nothing left to be done but to execute an instrument, this was an act ministerial in its character, the writ could issue, and thereon judgment might be rendered compelling them to perform, a case being otherwise made out by the applicant.   *Greenwood Cemetery Co. v. Routt et al.*, 17 Colo. 156.   This decision we substantially followed, announcing the same principle in *Rhodes v. The Board of Public Works*, 10 Colo. App. 99; *Bradbury v. Alden*, 13 Colo. App. 208.

It would be folly to attempt, even if we might succeed, to fortify what was so well and so accurately stated in those

opinions. It is enough for the purposes of this opinion to hold that mandamus will lie against the state land board to compel them to execute contracts where the rights of third parties have not intervened, and there is nothing left to be done but to perform a ministerial duty and execute a contract theretofore agreed on with respect to which rights of parties have vested. It only remains then to apply the doctrine to the facts as exhibited by this record, and to determine whether what the board did amounted to the making of a contract which the fuel and iron company have a right to compel them to carry out and wherein also the fuel company have a right to call on the land board for a written evidence of the contract into which they entered.

As preliminary to this question it may be well to dispose of a suggestion made by counsel on the argument, that the board had executed another lease to The Victor Coal & Coke Company which is outstanding, and that therefore they should not be compelled to execute another paper which would be antagonistic and perhaps involve the board and third parties who are not before the court with respect to their rights. We do not believe the position to be well taken. Counsel insist and it is undoubtedly true, and has been many times held that where rights of third parties are involved, mandamus will not ordinarily lie, but parties must proceed by bill in equity, bring those parties in, and in the suit thus initiated have their rights litigated and determined. We are quite of the opinion this case is not at all similar or in its facts analogous to those wherein this principle has been enunciated. As we view it, if we ultimately conclude what the land board did amounted to a contract between them and the fuel and iron company, the subsequent lease executed to The Victor Coal & Coke Company, was wholly invalid, they acquired no rights thereby and they are not prejudiced by these proceedings. Again, it is equally true it is not for the land board, which counsel insist is the only party represented, to contend that The Victor Coal & Coke Company are not before the court, to say that they have executed another lease, nor to

contest the use of this remedy because of this fact if it be one.
It is not enough for a party to insist that it is impossible for
him to perform the act where this impossibility has been oc-
casioned by his own doing.   Where it is the respondent's own
act which creates the impossibility, he may not plead it as a
defense to the writ and the enforcement of the right.   This
is the general principle asserted by all text writers and is
recognized by this court in *The First National Bank of
Northampton v. Arthur*, 12 Colo. App. 90.

A further answer to the contention that a bill in equity is
the only proper remedy is to my mind very strongly illus-
trated by the situation of the parties under existing con-
ditions.   It is undoubtedly true The Colorado Fuel & Iron
Company may not file a bill against The Victor Coal & Coke
Company without averring a lease and rights thereby ac-
quired.   It is a matter of grave question in my mind whether
setting up the facts as they appear in the statement, a bill
could be maintained against The Victor Coal & Coke Com-
pany for the cancellation of their lease, or to compel its trans-
fer.   The latter remedy of course is not at all effectual or
consistent with the rights of The Colorado Fuel & Iron Com-
pany.   This company is not insisting on an assignment of
the lease executed to The Victor Coal & Coke Company
which is totally different in its conditions from those ex-
pressed in the contract of the state land board.   The assign-
ment of the lease would neither be an adequate nor an ef-
fectual remedy, nor would it give the fuel and iron company
the rights to which they are entitled, if they are entitled to
any.   It is equally evident they could commence no action
at law to recover possession.   It requires leasehold rights
evidenced by an instrument executed by the proper author-
ities to entitle them to maintain law actions as well as bills
in equity to perfect their claims and establish their rights,
and we are quite unable to see how a bill in equity could be
framed whereon a decree could be rendered which would
give the fuel and iron company that to which it is entitled.
Whatever might be the right or the rule under other circum-

stances and other conditions, under the present, we think the one announced in *The People v. Fleming*, 4 Denio, 137, is entirely applicable and wholly correct. We then have a case wherein the proper remedy was adopted by the appellants subject only to the condition the case shows them to have a right and no other specific means of compelling its performance, which must necessarily be the conclusion providing we determine what the board did was lawfully done and resulted in a contract between the parties capable of enforcement.

We now come to this inquiry, the first branch of it we have already determined, and to our satisfaction at least have demonstrated that the fuel and iron company have no other remedy than the one by mandamus to enforce the right upon which they insist. Whether they had or had not this right, depends on the determination of two propositions: the one, the construction of the statute, the determination of its limitations and conditions; the second must be resolved from a consideration of the acts of the parties. We come to the first proposition which respects the proper construction of the statute. The theory of the trial court, as well as of appellees' counsel, is that the act of 1895, which is quoted in the statement, contains a mandatory limitation on the power of the board, and without the concurrence of the acts therein specified the board may not renew a lease. According to the terms of the original act of 1887, the land board was given full power to lease any portion of the lands of the state at a specified rental on a valuation, to be fixed, subject however, to this provision and this condition: if the lands contained coal, and with this only are we concerned, there is no limitation on the power of the board with reference to the terms of the lease or the time for which the demise may run. It is insisted, however, that the subsequent section found in the act of 1895 and fully quoted is applicable to coal leases as well as to leases of other lands. We do not so conclude with respect to any provision which affects the present controversy. We do not intend to construe the entire section or to determine its whole force and extent. We shall only refer

to those matters which may properly be used as the sub-
stratum of an argument respecting the validity of the state
land board's acts in the premises.   At first blush it would
seem that the first sentence in that section was wholly incon-
sistent with what preceded it, for it provides that no lease
shall be for a longer term than ten years.   It might better be
argued that while the preceding section gave them the right
to lease coal lands on certain conditions, it could still be ad-
judged that both sections were to be construed together and
that the words " upon such length of time as to the board
should seem just " was subject to the limitation of the suc-
ceeding section.   We find however, the supreme court in a
case entirely analogous and construing a like statute save as
to the term, has concluded otherwise and has determined on
full consideration that the matter of the lease of coal lands is
wholly within the discretion of the board with respect to the
term and the conditions on which the lease may be granted.
*In re Leasing State Lands*, 18 Colo. 359.

   This difficulty then is obviated and we now come to the
next provision, which is substantially that when any lease
expires by limitation the holder may renew at any time within
the thirty days next preceding, if he notifies the register of
his desire.   If the lessee and the board agree as to the valu-
ation a new lease may be issued bearing even date with the
expiration of the old one and upon like conditions.   The
position taken by the appellees and confirmed by the lower
court is that this is a mandatory limitation on the power of
the state land board with reference to leasing coal lands.   It
is quite impossible for us to follow counsel or the court be-
low and accept the argument which leads to this conclusion.
If the section which contains a direct limitation as to time
has no relation whatever to the powers of the land board
with reference to leasing coal lands, we are quite unable to
see why this provision respecting the renewal of leases may
likewise be so far extended as to be regarded as a mandatory
limitation on their powers.   It is one of the cardinal rules of
statutory construction that the object and purpose of a pro-

vision may be considered in order to determine its proper construction. Just exactly what the legislative intent was is exceedingly difficult to ascertain. We presume the purpose may have been to secure to the lessee a sort of preferential right to continue in the occupancy of the land and in the renewal of his lease providing he complies with this condition. But it is to be observed, however, he has by the terms of the statute no such preferential right. If the lessee, whether it be of agricultural or coal lands, assuming the provision to be applicable to the latter, makes an application to renew the lease within the thirty days next preceding the expiration of his term, the land board is under no obligation whatever, as the law now stands, to grant a renewal upon the same or upon any other terms. The whole thing is left to the absolute discretion of the board. It must therefore follow, if the discretion is left with the land board to grant or refuse, even though the application be within that time, this limitation is no restriction on its power. It would seem to follow that if this condition was essential and a mandatory limitation, the filing of the petition by the lessee within that time would necessarily be operative to compel the board to act. This however is not true. The board may or may not act, whether the petition be or be not filed within that time. It must therefore follow, that this is not a limitation on the power granted but a restriction or an obligation on the lessee to file his petition within that time, and one which deprives him of any equitable right to insist on a renewal if he fails to file it, at least within thirty days before its expiration. The phraseology of the section is questionable, and if it were necessary we should be very much inclined to hold that the word " within " was equivalent to " at least," and that the intent of the legislature undoubtedly was to require the lessee to file his application for renewal at least thirty days before the time of its expiration, that the board might have an opportunity to investigate the propriety of the renewal, seek other lessees, and make such provision as would seem in their judgment wise in order to

derive a revenue from the state lands. . We find, however, as a continuing part of this provision, that the lessee and the land board must agree as to the valuation of the land and if they do, a lease bearing even date with the old one and under similar conditions may be issued.   The subsequent provision however is that the former valuation may not be decreased without the consent of the board, and a further provision is found herein that nothing shall prohibit the board from leasing the land to such party as shall procure to the state the greatest revenue.   These provisions are wholly inconsistent with the evident purpose and policy of the legislature with respect to coal lands.   Under the decision of the supreme court the power of the board with reference to coal lands is exceedingly broad, and not subject to any of the limitations as to time provided in this section, nor with reference to any condition unless the conditions to which we have last referred are applicable.   This we do not believe. There is no provision for the valuation of coal lands either by statute or by practice.   The leases are granted on the payment of royalties, and the royalties are determinable by the board, measurable only by their judgment and discretion. · On the expiration of the lease there is no revaluation ; it is simply for the board to determine what royalty they will insist upon, what conditions they will impose and for what term they will lease the lands.   We do not believe that these are applicable to coal lands or are limitations on the power of the board with reference to leasing such property so long as the law is as has been declared by the supreme court, that the original specific limitation of time or term has no application to coal leases.   We might have concluded it was the legislative purpose to give the lessee a preferential right of renewal but for the provision that nothing in the section shall prohibit the board from leasing the land to any party who shall pay the greatest revenue to the state.   This destroys the force and effect of the provision in that aspect of it, and it really seems to stand without any very definite legislative purpose and object, either as a limitation on the

power of the board or as one granting a right to the lessee of state lands. Under these circumstances we may not conclude, under any rule of statutory construction with which we are familiar, that this is a mandatory limitation on the power of the board. As we look at it, there is another answer to the position that the board was without the power to make the contract which they attempted to execute. It cannot be affected by the provision, however it may be interpreted, because though the fuel and iron company made an application to renew the lease the board did not act on that application in the form in which it was presented, but at their own suggestion the application was practically abandoned or turned into an application for a new lease. The record shows that at the time the application was made the board suggested that in the matter of the renewal of No. 5244 the fuel and iron company should surrender their lease and accept a new one from the board for a fixed term and for larger royalty, to wit, a minimum royalty of $200 per annum in place of a royalty of $60.00 which had theretofore prevailed. Accepting the suggestion, the record shows the fuel and iron company did surrender the old lease which was accepted and then made a contract with the state land board for a new lease, for a definite term, for a specific royalty, and subject to the usual conditions which must be taken to be the conditions contained in the former lease No. 5244. This being true, the question as to the proper construction of the statutory provision and its applicability to other leases would seem to be wholly removed from necessary consideration. The question however being presented we deemed it best to express our opinion about it and rest our conclusion on both grounds.

We now come to the second proposition which is, what is the legal effect of what the state land board did, according to the facts disclosed by the evidence, and exhibited by its record? The Colorado Fuel & Iron Company were lessees of section 36 and had been for some years in possession of it and prosecuted their work with reference to its ultimate

exploration and development.    They were the owners or
lessees, it is unimportant which.    In developing the Pictou
mine they had run their upper levels to strike the upper vein
which was found to be too thin to be worked at a profit.
The workings on the second vein were being extended in the
direction of the land, and as far as explored the coal was
much thicker and of good quality.    Under these circumstan-
ces it was essential for The Colorado Fuel & Iron Company
to procure an extension of their lease or a new one for a term
sufficient to warrant the expenditure necessary to the open-
ing up of the property.    Thereupon they made the applica-
tion set out in the record.    Thereon the land board proceeded
to act.    Under its suggestion the original lease was surrend-
ered, the land board proceeded under the statute and in the
full exercise of their authority to consider and determine
whether or not a new lease should be granted and if so, upon
what terms.    They reached a conclusion and expressed it in
their record, and according to it, the board ordered that on the
surrender of the old lease a new one should be granted for
ten years at a minimum royalty of $200, and otherwise upon
the usual terms, reciting in their record that the old lease
was numbered 5244.    Thereupon the fuel and iron company
paid its half year's royalty by transmitting its check for $100
the amount of it, with $1.00 for recording fees, which were
accepted by the proper officer of the state land board, and
never returned or offered to be returned until several months
afterwards and the happening of the circumstances which
gave rise to this controversy.    The only thing then left to
be done was the formal execution of the lease.    Its terms
were agreed on.    The term was stated.    The royalty was
specified.    The former lease was referred to, the general con-
ditions of which would necessarily be the general conditions
of the new lease in the absence of other agreement.    They
were not entirely established by proof and the appellant should
have offered proof respecting the usual conditions of mining
leases and this might have been essential for the purpose of
a just expression of their rights by decree.    We do not be-

lieve however that the absence of this proof is enough to warrant us to affirm the judgment when otherwise we conclude the judgment is entirely wrong with respect to the fundamental questions on which it rests.    This being the situation it seems to us very clear, that when all these facts, circumstances, papers and records are taken into consideration, there is enough thereon and therein to make a complete and specific contract between the parties, and vest a right in The Colorado Fuel & Iron Company which they have a right to enforce and which can only be effectuated by the mandamus proceedings which were adopted.    The absence of a formal paper, to wit, a lease, is not enough to debar the lessees or to prevent the enforcement of their right as between them and the state land board.    As between private individuals . this has been adjudged enough.    *Post v. Davis*, 7 Kan. App. 217.

Most lawyers would concede that as between private individuals the result would be a lease between the parties enforcible by proper action either at law or in equity to protect the lessees' rights.    The only difference between this case and one between private individuals is that in all probability, though we do not directly decide it, a bill would not lie against the state land board, which is a part of the executive department of this government.    We can see many difficulties in the way of maintaining an action at law against the state land board ; they could not be compelled to respond in damages for failure to carry out their contract, and it is certainly a doubtful question as to whether a bill in equity for specific performance would lie as against them. Mandamus will lie to compel the execution of this lease as the supreme court has directly decided.    It is the only adequate and specific means of compelling performance, and when once the lease is executed, which is a ministerial act, whatever rights the fuel and iron company may have will be adequately protected, and they can bring such action at law or suit in equity based thereon as they are entitled to maintain.    We thus reach the conclusion that what was done amounted to

a contract sufficiently executed to warrant mandamus, that there was nothing left to be done except the ministerial act of executing the paper, and that this act may be compelled by this proceeding.

There are very grave doubts in our minds, though possibly it may not be essential to the decision of the case, whether it was within the power of the land board to rescind the action of their predecessor and make a new contract which would be of any value or validity. Similar action was attempted by a subsequent secretary of the interior under a second administration, acting under an act of congress, and the supreme court of the United States in a well considered case, held the subsequent secretary could not either interfere with, modify, reverse or set aside the action of his predecessor when rights of third parties had intervened and become vested. *Noble v. R. R. Co.*, 147 U. S. 165.

If this be the law with reference to the officers of the general government, we see no reason why it should not be applicable to the land board of the state under successive administrations. In this case, under a former governor and former land board, a new lease was attempted to be made, or a contract made between the board and the fuel and iron company. When they paid their money or gave check which was its equivalent as it was accepted by the proper officer, their rights became vested and they had a right to insist thereafter that a new lease should be executed in accordance with the action then taken. We are quite unable to see how it was within the power of a subsequent administration and a new board to rescind that action, deprive a party of rights which had already vested and arbitrarily in the exercise of their discretion, determine that what their predecessors had done, was neither right, lawful nor expedient.

It may be wholly unnecessary to refer to the motion with respect to the striking out of the opinion of the lower court. As we conceive, the motion would never have been made but for the desire of counsel to rely on the general finding incorporated into the judgment, to the effect that the court

found the issues in favor of the defendant as against the plaintiff, therefrom deducing the conclusion that the court found all the facts with the defendant, and those facts being found with the defendant the plaintiff could not successfully sustain his appeal. Not contesting the general rule which prevails in such cases, we think this court has the right to resort to the opinion of the judge presiding at the trial in order to ascertain the basis on which he rests his conclusion. We do not at all criticise the incorporation of the opinions of the lower courts into the record. On the other hand, they are frequently of great aid and assistance to the court in determining where the right lies as between the litigants, they are frequently lucid and satisfactory statements of their conclusions respecting the facts, and we often derive great aid from the well considered expositions of the law which are deemed applicable to the controversy. Instead of criticising their incorporation, we are inclined to commend the practice.

We now refer to the cross assignments of error. As we look at it, the propriety and character of the practice is well settled. Under the statute, parties have a right to file cross assignments of error and thereon obtain the opinion of the appellate court that they may obtain such ruling as shall be a guide and a benefit to the lower court, to them, and to their clients in the litigation which may be continued on a reversal of the case.

This brings us to the consideration of what seems to be the only question raised by the cross assignment which is at all important. This is the matter of fraud which is alleged as a reason or a basis for the subsequent action taken by the state land board. We do not believe that there is either in the answer or in the evidence any proof whereon a claim of fraud can be predicated or which will constitute a defense to this application. The only particular fraud averted to is found in the affidavit of Mr. Kebler which states his belief that if there is any workable coal in the section, it is so located that it is not practicable to work it from the surface at any point on the section, but only from adjacent ground. This is not

a statement of an absolute fact upon which the state land board would have the right to rely in determining whether or not they should extend the lease or grant a new one. By its very terms it is simply the belief of the manager, and it is evident from its very language that it is simply the expression of an opinion, and that opinion respects a matter as fully within the knowledge of the lessors, to wit, the state land board as within the knowledge of the lessee which was prosecuting the work in the Pictou mine.   The matter was wholly open to the knowledge and the investigation of the land board, and in fact these very records demonstrate that after this controversy arose they sent an inspector down to examine the property, determine its geological condition, its practical situation and probable value.   This might as well have been done prior to the time the board took its action as afterwards, and we do not believe that the evidence which was offered in that direction either tended to establish fraud, or if true, would have demonstrated fraud sufficient to warrant the court to set aside the lease or refuse to compel its execution.   In a somewhat similar case this court reached a similar conclusion from which we see no reason to recede. *The People v. Tynon et al.*, 2 Colo. App. 131.

We do not regard the evidence which was offered to the proposition that the representation influenced the action taken by the board was sufficient either in terms, form, substance or character to justify any judgment on that question.   What was stated in the affidavit was not stated in such form that the board had a right to rely on it, nor did the evidence which was introduced tend to show that the board did rely upon that statement as a substantive fact upon which to predicate their action.   The evidence of the members of the board was not satisfactory in that direction, nor does it serve to convince us that the board relied on the affidavit at the time they made the lease or made the order which was found in their record.   Taking it altogether as a matter of law, we should be compelled to hold that there was no evidence that the board relied on that affidavit in such a way as to conclude

the fuel company, or that the court might find their representations to be fraudulent in such a legal sense as to deprive the fuel company of their present remedy.

The only other question which it seems to us necessary to consider is with respect to the legality of the meeting and the service of notice upon the various members of the board. We are ready to admit there was a decided conflict of testimony as between the register of the state land board and Mrs. Peavey and her assistant.    We do not feel called on to decide this question and our reference to it is made more out of deference to counsel than because of a necessity for its decision.    The opinion of the lower court is direct to the proposition, and it states its conclusion from the evidence that the meeting of December 30, was valid, and that the burden was on the defendants to show its invalidity.    The court held the presumption to be, that the officer did his duty, and states that the evidence respecting the notice was contradictory.    He concludes that the proof presented by the defendant which was unquestioned was insufficient to overcome the evidence of the register and the presumption in favor of the regularity of the meeting.    We agree with him upon the record.    The conclusions of the trial court on these several matters are wholly supported, entirely right, and with them we are in full accord.

So far as we can see we have discussed and disposed of all matters essential to the determination of the issue.    The opinion is greatly extended, and we perhaps decide some questions which are not absolutely essential to the case, but it has been so well presented, so thoroughly and ably argued by counsel in their briefs and at the bar, that we felt compelled to unduly protract this opinion in order to dispose of the various questions to which they seem to attach such great importance.    The controversy is one involving large interests. Much money has been expended by the contending parties, and while theoretically The Victor Coal & Coke Company are not before the court, the attorney's signature attached to the brief and the proof offered that they have expended a

large amount of money, relying upon the action of a branch of the executive department of the government, compelled us to spend perhaps an undue amount of time and labor in attempting to correctly resolve the controversy.   We believe we have accurately decided it, that the conclusion of the lower court was wrong, and its judgment must, therefore, necessarily be reversed.

*Reversed.*